IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cr-00123-RDA-8 |
| | ) | |
| PABLO MIGUEL VELASCO BARRERA, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE PURSUANT TO RULE 403**

The defendants in this case stand accused of kidnapping and murdering two juveniles for

their perceived affronts to the depraved code of MS-13, one of the most ruthless and violent gangs

presently operating in the United States. One of those defendants, Pablo Miguel Velasco Barrera

("Velasco"), perfunctorily joined by his co-defendant Ronald Herrera Contreras ("Herrera"), seeks

to employ Rule 403 of the Federal Rules of Evidence as a shield, asking the Court to bar the

government from admitting and publishing at trial two videos depicting a portion of one of the

murders on the ground that the videos will unduly prejudice him in the eyes of the jury. Docket

Entries ("DEs") 837, 894.[1] Audaciously, Velasco does not just attempt to use the viciousness of

his crimes to justify the exclusion of evidence tending to show that he perpetrated them, but further

maintains that the videos do not contribute "any meaningful relevant material to the government's

case." DE 837 at 1. This does not just strain credulity, it eviscerates it. As Velasco well knows,

---

[1] In his motion, Velasco refers to "brief videos purported to be taken during the alleged killings of decedents S.A.A.T. and E.E.E.M." DE 837 at 1. While the evidence will show that E.E.E.M.'s murder was indeed recorded, the government does not, as of the date of this memorandum's submission, have a copy of that video. What the government possesses, and long ago produced to the defense, are two brief videos of S.A.A.T.'s murder.

in one of the videos, a co-conspirator of his can be heard saying in Spanish, "Alright, that's enough, that's enough, Pablo."   What is more, one of the government's cooperating witnesses, upon reviewing still images of that video, identified Velasco as one of the individuals striking the victim's body with what appears to be a machete.   If this is not relevant to the government's case, then nothing is.

Fundamentally, Velasco's motion is an attempt to hide behind the brutal nature of his conduct, to keep from the jury evidence of his guilt on the premise that it is too disturbing to be rationally considered.   The Court should stop this cynical ploy in its tracks and deny the motion.[2]

## RELEVANT BACKGROUND

In November 2016, officers with the Montgomery County Police Department arrested Edenilson Misael Alfaro ("Alfaro"), a high-ranking member of the Park View Locos Salvatruchas clique of MS-13, who was wanted for murder in Marin County, California.   When he was arrested, Alfaro was in possession of a cell phone, which was seized by law enforcement.   After obtaining a search warrant, law enforcement officers reviewed data extracted from the cell phone and discovered a video, which lasts approximately 52 seconds, depicting a victim lying face down on the ground while multiple subjects are striking him with weapons, including a kitchen knife and at least one machete.   The victim is wearing plaid boxer shorts and multi-colored pajama pants, the latter of which were consistent with what S.A.A.T.'s family said he was wearing when he was last seen alive.   Also on Alfaro's phone was a shorter video, which lasts approximately 17 seconds and

---

[2] It is worth contemplating the perverse precedent that accepting Velasco's position would set.  Granting his motion would reward him for the monstrous character of his crimes.  Other courts have recognized as much and rejected defendants' attempts to sanitize the evidence of their offenses.  *See United States v. Lujan*, 603 F.3d 850, 858 (10th Cir. 2010) ("[C]ourts have not allowed defendants to benefit from a Rule 403 exclusion for unfair prejudice simply because their conduct was of a grisly nature.").  This Court should, too.

which was recorded an unknown amount of time after the longer video was taken, in which the same victim's mutilated body can be seen. As part of its investigation, the FBI later produced enhanced versions of the videos intended to improve the clarity of the images and the quality of the audio accompanying them. Those versions, like the originals, have been provided to the defense.

### LEGAL STANDARDS

It is well-established that when the probative value of evidence is *substantially* outweighed by a danger of *unfair* prejudice, a court may exclude it. *See* Fed. R. Evid. 403.[3] In this context, "unfair prejudice" refers to "prejudice that damages an opponent for reasons other than its probative value, for instance, an appeal to emotion." *United States v. Mohr*, 318 F.3d 613, 620 (4th Cir. 2003); *see also* Fed. R. Evid. 403 advisory committee's note (stating that "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). To exclude evidence on the ground of unfair prejudice, then, "the district court must be convinced that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Van Metre*, 150 F.3d 339, 351 (4th Cir. 1998) (internal quotation marks omitted). Where, however, the evidence has probative value and its introduction is not sought for the purpose of inflaming the jury, it is admissible, regardless of whether jurors might find it disquieting. *See United States v. Salameh*, 152 F.3d 88, 123 (2d Cir. 1998)

---

[3] According to Velasco, under Rule 403, "otherwise relevant evidence may be excluded if its probative value is outweighed by a danger of unfair prejudice." DE 837 at 1. This materially misstates the standard. For evidence to be excluded under Rule 403, "its probative value must be *substantially* outweighed by the [danger of unfair prejudice], rather than simply not more probative than prejudicial." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1237 (3d Cir. 1993) (emphasis added) (internal quotation marks omitted).

("Probative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact."). After all, "Rule 403 is a rule of inclusion, generally favoring admissibility[.]" *United States v. Udeozor*, 515 F.3d 260, 264–65 (4th Cir. 2008) (internal quotation marks and alterations omitted); *see also United States v. Kapp*, 419 F.3d 666, 677 (7th Cir. 2005) ("[I]f evidence is probative of an issue relevant to an element of the offense, it must be admitted in all but the most extreme cases."); *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979) ("Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing.").

## ARGUMENT

Because the videos are axiomatically probative, and because any risk of unfair prejudice that showing them to the jury might engender does not, as it must, substantially outweigh that probative value, Rule 403 does not compel the videos' exclusion. On top of that, there is no suitable alternative to introducing the videos that will allow the government—or the jury—to realize fully their potency. For those reasons, as well as those articulated below, the Court should deny Velasco's motion *in limine* once it has had an opportunity to review the relevant evidence in chambers.

## I.    THE PROBATIVE VALUE OF THE MURDER VIDEOS IS EXCEPTIONALLY HIGH

It is hard to imagine evidence more probative than these videos. There are at least five reasons why that is so. *First*, and foremost, the videos, in different ways, place three of the four non-capital defendants at the scene of the crime. As explained above, in one of the videos, an individual wearing a distinctive jacket and a distinctive pair of pants can be seen striking the victim. Shortly before he stops doing so, one can hear in the audio accompanying the video another

attacker instructing "Pablo" to stop his assault.[4]  The government expects that one of its cooperating witnesses will identify that individual as Velasco, thereby confirming what can already be reasonably deduced from the video and its audio.  In that same video, one of the attackers commands his fellow assailants to "give the machete to . . . Certero."  The government alleges in the operative indictment, *see generally* DE 162, and will prove at trial, that "Certero" was Defendant Henry Zelaya Martinez's gang moniker at the time of the murder.  Finally, when the other video opens, an individual can be seen throwing MS-13 gang signs with his bloodied hands.  The video does not capture that person's face, but the government anticipates that at least one cooperating witness who was present at the time will testify that the person throwing those gang signs is Herrera.

*Second*, the videos corroborate the anticipated testimony of numerous government witnesses regarding what happened on the night of September 26, 2016, including where the murder occurred, how it unfolded, what weapons were used to perpetrate it,[5] and who was there at the scene.  *Cf. United States v. Fields*, 483 F.3d 313, 355 (5th Cir. 2007) (ruling that district court properly admitted "shocking" autopsy photos in part to corroborate other testimony); *United States v. Analla*, 975 F.2d 119, 126 (4th Cir. 1992) (upholding admission of photo of victim, who had been shot in head, lying in pool of blood because it corroborated witness's testimony regarding position of victim's body).

---

[4] As the Court knows, only one person named Pablo has been alleged to have participated in S.A.A.T.'s murder.

[5] One of the videos shows a bloody, single-edged kitchen knife resting on the ground near the victim's body.  A knife consistent in appearance with that one was found near the buried remains later identified as S.A.A.T.

*Third*, the videos help to establish the victim's identity.  That is because they show the victim wearing plaid boxer shorts and multi-colored pajama bottoms.  The former is relevant because when his remains were exhumed, S.A.A.T.'s corpse was garbed in distinctive, plaid boxer shorts identical in appearance to those worn by the victim in the murder videos.  The latter is relevant because the pajama bottoms visible in the murder videos are consistent, in terms of their appearance, both with S.A.A.T.'s family's description of what he was wearing on the night that he disappeared and with scraps of fabric located near one of the victim's gravesites at the time it was excavated.

*Fourth*, the videos show some of the very events underlying some of the charges for which Velasco and his co-defendants will stand trial.  Thus, the videos permit one who views them to become a witness to those crimes with no need to make credibility determinations or rely on witness testimony.  *Cf. United States v. Con-ui*, No. 3:13-CR-123, 2017 WL 783437, at *4 (M.D. Pa. Mar. 1, 2017) ("Here, there is no 'tendency to show'; the [murder] video *shows* the crime charged.").

*Fifth*, the longer video, in which multiple individuals can be seen violently and repeatedly hacking the victim's body, is compelling evidence of the attackers' intent to murder S.A.A.T. or, at a minimum, their intent to aid and abet his murder.  *Cf. United States v. Pinke*, 614 F. App'x 651, 652 (4th Cir. 2015) (agreeing that "gruesome" video of prisoner assault passed Rule 403 muster in part because it "tend[ed] to demonstrate [that the defendant] and his codefendants intended to murder the victim").  In this vein, the video, which the assailants must have known was being made given that it was the light from the recording cell phone that illuminated the victim's body, is also probative insofar as it tends to show that S.A.A.T.'s assailants intended their actions to serve as proof to higher-ranking clique leaders that they had acquitted themselves well

enough to justify a promotion.   In other words, the videos are evidence of the motive that the government alleges inspired the defendants' crimes—namely, their desire to maintain or increase their position in MS-13.  *See generally* DE 162.

In view of the foregoing, it cannot seriously be disputed that the murder videos are highly probative.

## II.     ANY RISK OF UNFAIR PREJUDICE POSED BY THE MURDER VIDEOS' ADMISSION AND PUBLICATION DOES NOT SUBSTANTIALLY OUTWEIGH THEIR PROBATIVE VALUE

Like all evidence that tends to incriminate an accused, the murder videos are undeniably prejudicial to Velasco and his co-defendants.  Their introduction and publication at trial does not, however, present a genuine danger of *unfair* prejudice—*i.e.*, a risk that introduction of the evidence will "subordinate reason to emotion in the factfinding process." *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997).  In large measure, that is because the videos, while chilling and difficult to watch, depict the commission of some of the heinous crimes with which the defendants have been charged. *See United States v. Torrez*, 869 F.3d 291, 302 (4th Cir. 2017) (observing that Rule 403 does not preclude introduction of evidence that "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged" (internal quotation marks and citation omitted)); *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (rejecting Rule 403 challenge where evidence "did not involve conduct more inflammatory than the charged crime"); *see also United States v. Smith*, 459 F.3d 1276, 1296 (11th Cir. 2006) ("That the nature of the crime itself, and therefore the nature of the evidence tending to prove it, is emotionally charged does not mean that the prosecution must be deprived of its most probative evidence.").

Moreover, in showing some of the charged crimes taking place, the videos do not capture S.A.A.T. screaming or otherwise exhibiting agony.  Indeed, throughout the duration of both brief videos, S.A.A.T. lies motionless, face down on the ground.  That does not mean that the images

are easy to behold, but the Court "is not required to scrub the trial clean of all evidence that may have an emotional impact." *United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008). For this reason, in the analogous context of photographic evidence, courts have admitted evidence approximately as unsettling as the short videos that the government seeks to play for the jury. *See, e.g.*, *Gov't of V.I. v. Krepps*, 438 F. App'x 86, 88–89 (3d Cir. 2010) (determining that danger of unfair prejudice did not substantially outweigh probative value of photos of partially mummified and decomposed corpse, including one that showed hole in victim's back where fatal stab wound was suffered); *United States v. Collins*, 368 F. App'x 517, 521 (5th Cir. 2010) (upholding admission of crime scene photos showing how decapitated and dismembered body looked when it was discovered); *Fields*, 483 F.3d at 354 (affirming district court's rejection of challenge to admissibility of crime scene photos that showed body in advanced state of decomposition and subject to animal predation); *United States v. Tokars*, 95 F.3d 1520, 1529, 1537 (11th Cir. 1996) (deeming "meritless" defendant's argument that crime scene photo depicting victim who died from "a gunshot wound to the head delivered from a distance of approximately one foot or less" should have been excluded under Rule 403); *United States v. Sides*, 944 F.2d 1554, 1563 (10th Cir. 1991) (opining that crime scene photos showing blindfolded victim's entrance wounds and blood-stained shirt were "in no sense so shocking as to have unfairly prejudiced the defendant" (internal quotation marks omitted)); *United States v. Brady*, 595 F.2d 359, 361 (6th Cir. 1979) (finding no abuse of discretion where district court admitted photos of three victims killed in bank robbery shown lying in pools of blood); *McRae*, 593 F.2d at 707 (holding that admission of photos of victim and crime scene did not violate Rule 403 where they depicted, among other things, victim's corpse clothed in bloody garments and bent forward so as to display exit wound in back of her

skull produced by bullet that had exploded in her brain).  The logic underlying these decisions

supports the government's position that the murder videos are not unfairly prejudicial.

Even assuming that the murder videos pose a danger of unfair prejudice, that alone is

insufficient to exclude them under Rule 403.  Rather, the risk must be *disproportionate* to the

videos' probative value.  *See Van Metre*, 150 F.3d at 351.  A corollary of this prerequisite is that

the more probative evidence is, the less likely it is to pose such a disproportionate risk.  *Cf. United*

*States v. Jackson*, 886 F.2d 838, 847 (7th Cir. 1989) ("[T]he more essential the evidence, the

greater its probative value, and the less likely that a trial court should order the evidence

excluded.").  Here, as stated, the probative value is extraordinarily high.  To be kept out, then, the

murder videos would have to pose an overwhelming risk of unfair prejudice.  They do not.  *Cf.*

*Con-Ui*, 2017 WL 783437, at \*2, 5 (allowing government, during guilt phase of capital trial, to

play video depicting correctional officer "as he is kicked down a flight of stairs, his efforts to

escape, the infliction of over 200 stab wounds, kicks to the head, and other acts of violence").

Therefore, Rule 403 does not necessitate the videos' exclusion.

## III.   NO ALTERNATIVE TO ADMITTING AND PUBLISHING THE MURDER VIDEOS SUFFICES

The government expects that Velasco and his co-defendants, knowing that they cannot

credibly argue that the murder videos are anything but highly probative, will seek to dilute the

force of the evidence by asking the Court to adopt some manner of compromise approach whereby

the videos themselves are not entered into evidence but aspects of them—such as still images taken

from them or their audio components—are admitted.  For two reasons, the Court should decline

any such invitation.

*First*, introducing still images pulled from the videos alone would significantly—and

unjustifiably—diminish the probative value of the evidence.  The videos were taken in the woods

on a dark night.  As a result, they are somewhat grainy, and notwithstanding the FBI's efforts to enhance them, they lack perfect clarity.  When still images are captured, saved as separate files, and then printed out, the loss of image fidelity is marked.  If all the jury sees during the trial are such still images, and if all the jury has to consult during its deliberations are printed copies of those still images, they will not fully appreciate what the videos convey.

*Second*, playing just the audio that accompanies the videos is untenable.  As an initial matter, doing so would mean forfeiting a substantial amount of probative evidence—*e.g.*, the victim's plaid boxer shorts and multi-colored pajama pants, the person throwing MS-13 gang signs, the individual wearing the distinctive jacket and pants who can be seen repeatedly striking the victim, the kitchen knife, etc.—that only exists in visual form.  Beyond that, there are aspects of the video that only achieve their full effect when the moving images are paired with the audio. For instance, as described above, the person wearing the distinctive jacket and pants, who the evidence will show is Velasco, stops striking the victim shortly after someone else, who is not in the camera's frame, tells "Pablo" to stop.  If just the audio were admitted, or even still images and the audio but without the video, it would not be possible for the jury to comprehend what the video and audio together make plain: that the individual is, in fact, Velasco.

These points, of course, are not easily conveyed in the abstract, and the government recognizes that the Court, unlike the parties, has not had an opportunity to review the murder videos or listen to their contents with the aid of a translation.  Likewise, the Court cannot fully appreciate, based on this memorandum alone, how the process of capturing still images and then printing them out erodes their quality.  Accordingly, the government has submitted this day, separately and under seal, the following: (1) the murder videos (in both their original and enhanced forms); (2) a Spanish transcription of the videos' audio components alongside an English

translation of the same; (3) a representative sample of still images taken from the videos and saved as .PNG files; and (4) hardcopy printouts of those still images.[6]  Reviewing these materials in camera will not only allow the Court to make an informed decision regarding the relief Velasco requests, but also permit the Court to support its ruling with pertinent factual findings.  The government is confident that upon doing so, the Court will reject any solicitations to water down evidence of the defendants' guilt, deny the motion, and permit the government to play the videos for the jury.[7]

* * *

"Once it is recognized that evidence is probative of an element of the crime charged, 'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.'"  *United States v. Bajoghli*, 785 F.3d 957, 966 (4th Cir. 2015) (quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)).  This is not one of those rare instances where the exclusion of exceptionally probative evidence is warranted.

## CONCLUSION

For the reasons stated, the Court should reject Velasco's request to preclude the government from introducing the murder videos and deny his motion.

---

[6] The original murder videos were produced to the defendants in July 2018 as part of the government's First Discovery Production.  The enhanced murder videos were produced in July 2019 as part of the government's Fifth Discovery Production.  In accordance with the Court's Scheduling Order, *see* DE 856 at 2, the Spanish transcription and English translation of the audio portions of the recordings were provided to the defendants on June 15, 2021.

[7] To be clear, the government intends to seek the admission of still images from the videos regardless of whether the Court allows it to play the videos for the jury.  To recall during its deliberations what the videos showed when they were played during the trial, the jury should have the option of reviewing those stills, rather than being forced to rewatch the videos.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By:         /s/
Rebeca H. Bellows
Alexander E. Blanchard
Cristina C. Stam
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
becky.bellows@usdoj.gov
alexander.blanchard@usdoj.gov
cristina.stam@usdoj.gov

12

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 9, 2021, I electronically filed a copy of the foregoing with the Clerk

of the Court using the CM/ECF system, which will send a notification of such filing to all counsel

of record.

_____/s/_____

Alexander E. Blanchard
Assistant United States Attorney
