IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 1:18-cr-00123-RDA |
| | ) |
| RONALD HERRERA CONTRERAS, et al., | ) |
| | ) |
| Defendants. | ) |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO CONTINUE JURY TRIAL**

Some of the defendants in this case have been in pretrial detention for *over three years*, awaiting trial on charges stemming from murders that occurred nearly five years ago. Naturally, they are eager to have their day in court. However, defense counsel—evidently over their clients' objections—have asked the Court to delay the trial, which was originally supposed to commence in August 2020, yet again. *See* Docket Entry ("DE") 968 at 1 ("Undersigned counsel has consulted with counsel for all three co-defendants and *notwithstanding the defendants' positions on continuance* have all expressed concern for their own health and the health of their families[.]" (emphasis added)). Defense counsel base their request to keep kicking the can down the road on the supposed need to safeguard their clients' rights under the Sixth Amendment (though they conspicuously whistle past one such privilege—the right to a speedy trial—entirely). At each turn, however, they point to nothing but conjecture. For that reason, as well as those articulated below, the defendants' motion should be denied.[1]

---

[1] Although it appears that the defendants themselves do not want the relief sought in their name by the instant motion, for ease of reference, the government refers to the defendants, not their counsel, throughout the remainder of this memorandum.

## ARGUMENT

Even though the suspension of jury trials in this District previously necessitated by the COVID-19 pandemic remains lifted, the defendants contend that proceeding with trial as scheduled would be unsafe, given the recent surge in cases caused by more pernicious variants of the virus, and threatens to compromise their constitutional right to be tried by a jury composed of members representing a fair cross-section of the community.  These unfounded fears sell short the Court's ability to conduct safe, fair trials and, as one jurist in the Alexandria Division recently concluded, fail to justify a continuance of the trial date.

**I.     This Court Has Successfully Held Trials Under Chief Judge Davis's Carefully Considered COVID-19 Protocols and Can Continue To Do So**

In asking for a continuance, the defendants seek to set aside the carefully considered General Order currently governing courthouse operations in this District.  After considering the same COVID-19 trends and developments that the defendants now raise, Chief Judge Davis has adopted a sensible and conservative policy of requiring masks and social distancing for all individuals entering the courthouse and court facilities.  *See* General Order 2021-11 at 4–5.  This order requires all individuals entering the courthouse to wear masks and to maintain at least six feet of distance from people outside of their households whenever possible, regardless of their vaccination status.  *Id*.  This extends to jury proceedings, where the requirement is now six feet of distancing as opposed to the three feet that had previously been deemed sufficient.  Chief Judge Davis's order reflects the recommendations from the Centers for Disease Control and Prevention (the "CDC") and local public health officials that individuals in areas with substantial or high community transmission should wear masks in public and maintain social distancing.[2]

---

[2] *See* Centers for Disease Control and Prevention, *Interim Public Health Recommendations for Fully Vaccinated People*, available at https://www.cdc.gov/coronavirus/2019-

Notably, while the rates of COVID-19 are rising from a recent low, they still remain well below the levels they reached at their peak. In particular, the historical data provided by the City of Alexandria demonstrates that both cases and deaths are well below the rates they were in June 2020, when the district resumed court operations after an initial pause at the beginning of the pandemic:[3]



---

ncov/vaccines/fully-vaccinated-guidance.html; City of Alexandria, *COVID-19: Protect Yourself & Others*, available at https://www.alexandriava.gov/health/info/default.aspx?id=114727.

[3] City of Alexandria, *Alexandria COVID-19 Dashboard: Historical Data*, available at https://www.alexandriava.gov/performance/info/dashboard.aspx?id=114883%20.

This overall decrease in cases from the pandemic's peak, reflected in both local and national numbers, has been driven by the widespread distribution and embrace of vaccines, coupled with the adoption of measures such as masking and distancing to limit the spread of the virus. The vaccines in particular have proven extremely effective at preventing and mitigating all forms of the disease, including disease caused by the delta variant. For example, clinical trials have demonstrated that the Pfizer-BioNTech and Moderna vaccines are 96% effective at preventing hospitalization even for adults 65 to 74 years old—a particularly vulnerable population.[4] The vaccines also offer high protection against the delta variant. Research indicates that the Pfizer-BioNTech vaccine is 88% effective at preventing symptomatic COVID-19 caused by the delta variant, and 96% effective at preventing severe disease caused by the variant, while the Moderna vaccine is 72% effective against symptomatic disease and 96% effective against severe disease caused by the delta variant.[5] The vaccines are unquestionably highly effective against COVID-19 and help significantly to mitigate both the spread and risk of the disease. *See, e.g., United States v. Tagliaferro*, No. 19-cr-472, 2021 WL 1225990 at *5 (S.D.N.Y. Mar. 31, 2021) (citing much lower vaccination rates in denying motion to continue).

The widespread adoption of the COVID-19 vaccine also helps protect unvaccinated and other at-risk individuals.[6] Additionally, the surrounding community has a very high rate of

---

[4] *See* Heidi L. Moline, et al., *Effectiveness of COVID-19 Vaccines in Preventing Hospitalization Among Adults Aged ≥ 65 Years*, available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7032e3.htm.

[5] *See* Mayo Clinic, *Do COVID-19 Vaccines Prevent Against the Variants?*, available at https://www.mayoclinic.org/coronavirus-covid-19/covid-variant-vaccine.

[6] *See, e.g.,* Center for Infectious Disease Research and Policy, *High COVID Vaccine Uptake May Protect the Unvaccinated* (June 10, 2021), available at https://www.cidrap.umn.edu/news-perspective/2021/06/high-covid-vaccine-uptake-may-protect-unvaccinated.

vaccination, with nearly 60% of adults fully vaccinated, and just under 70% having completed at least one dose.[7]

Reflecting these realities, this District has successfully held over 20 jury trials since resuming operations, including lengthy trials lasting multiple weeks, as well as multi-defendant trials. *See, e.g., Tagliaferro*, 2021 WL 1225990, at *6 (citing six criminal trials since September 2020 as evidence that trial could safely proceed). As a result of the Court's carefully considered and rigorously applied COVID-19 protocols, there have been *zero* reported incidents of COVID-19 transmission stemming from these trials. This Court has thus demonstrated that it can proceed safely by applying the protective guidelines recommended by public health experts. In contrast, the defendants' concerns would essentially require trials to be put on hold indefinitely, an unrealistic and impractical request, particularly in cases, like theirs, where the accused are being detained pending trial. *See, e.g., Tagliaferro*, 2021 WL 1225990, at *6 ("Furthermore, the COVID-19 uncertainties that pervade our society are reasons to accept the status quo as the new normal and move ahead with trial now, as opposed to putting the trial off indefinitely and wishing in earnest for a better future.").

II. **The Defendants' Fair-Cross-Section and Related Arguments Are Premature and Unfounded**

According to the defendants, the trial must be continued because proceeding as scheduled *might* jeopardize their right to a jury drawn from a fair cross-section of the community. Before the Court has even assembled the venire, the defendants argue that jury summonses issued now are "unlikely to produce a lawful cross-section of the community." DE 968 at 9. This claim fails because (1) it is premature; (2) the defendants have not demonstrated any failure to comply with

---

[7] *See* City of Alexandria, *COVID-19 Vaccinations*, available at https://www.alexandriava.gov/performance/info/dashboard.aspx?id=120654.

the Jury Selection and Service Act of 1968 (the "JSSA"); and (3) they cannot meet the second or third prongs of the applicable fair-cross-section test.

*First*, the defendants allege that this Court is "unlikely" to produce a jury that represents a lawful cross-section of the community. This assertion is prematurely made. A fair-cross-section claim cannot arise before the venire is even called—at a minimum, the second and third prongs of the fair-cross-section test, discussed in greater detail below, require showing a *pattern of venires* that lack fair and reasonable representation based on a *systematic* exclusion of certain segments of the local population. *See Duren v. Missouri*, 439 U.S. 357, 360 (1979). Furthermore, a defendant cannot establish a *prima facie* violation of the fair-cross-section requirement by relying solely on the composition of the venire at his own trial. *See McGinnis v. Johnson*, 181 F.3d 686, 690 (5th Cir. 1999) ("[A] one-time example of underrepresentation of a distinctive group wholly fails to meet the systematic exclusion element of *Duren*."). As a result, the defendants' claim is entirely premature and should be rejected.

*Second*, "[t]o obtain relief under the [JSSA], a defendant must prove a 'substantial failure' to comply with the Act's provisions, a substantial failure being one that destroys the random nature or objectivity of the selection process." *United States v. Olaniyi-Oke*, 199 F.3d 767, 772 (5th Cir. 1999). The "happenstance" of a disproportionate jury venire is simply not enough to prevail under the JSSA—not every venire will match the proportions of minorities in the community, given the nature of random selection and the size of the sample. *Id*. The defendants' claim fails to challenge the selection process—"which is what [28 U.S.C.] § 1867 is designed for," *id.*—and instead alleges that the venire *might* fail to represent a fair cross-section of the community. The defendant in *Olaniyi-Oke* similarly alleged that his venire had "too few" minorities. After noting that every venire would not match the proportions of minorities in the community based on the nature of randomness, the Fifth Circuit held that the defendant's claim was not cognizable under the JSSA

6

because no showing was made of any failure to comply with the statute.  This Court should reach the same result.

*Third*, the defendants cannot meet the second or third prongs of the fair-cross-section test.  The Sixth Amendment and Due Process Clause of the Fifth Amendment both require that juries be drawn from a "fair cross-section" of the community.  *See Berghuis v. Smith*, 559 U.S. 314, 319 (2010); *Duren*, 439 U.S. at 360; *Taylor v. Louisiana*, 419 U.S. 522 (1975).  This does not, however, mean that the Constitution guarantees "a jury of any particular composition."  *Taylor*, 419 U.S. at 538.  To establish a *prima facie* violation of the fair-cross-section requirement, a defendant must demonstrate the following three criteria, commonly referred to as the *Duren* test:

> (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364.  A defendant's failure to meet any one of these elements defeats the fair cross-section claim.  *See United States v. Lewis*, 10 F.3d 1086, 1089–90 (4th Cir. 1993).

The defendants' initial burden is to demonstrate the percentage of the community made up of the group alleged to be underrepresented in relation to the percentage of that group in the jury venires.  *See United States v. Sanders*, No. 10–00351, 2014 WL 2600340, at *2–3 (W.D. La. June 9, 2014) (noting that "absolute disparity" is an appropriate way to measure the proportion of jury-eligible members of a distinctive group in the community versus its representation in jury venires). The defendants attempt to meet this burden by alleging that "nationally, all people of color are more likely to be infected with the coronavirus than white, non-Hispanic persons," and that it is thus "all but certain" that all people of color will be underrepresented in the local jury pool.  DE 968 at 9.  But this vague supposition does not establish that the representation of "people of color" in venires from which juries are selected is not fair and reasonable in relation to the representation

7

of these groups in the community. *See Berghuis*, 559 U.S. at 319. The allegations amount to little more than guesswork, with the defendants ultimately speculating on who will and will not appear for jury service, and how that will compare to the overall population.[8] These allegations cannot meet the second prong of the *Duren* test, and the claim fails for that reason alone.

Notably, district courts in the Eastern District of Louisiana also repeatedly rejected similar claims following Hurricane Katrina—*i.e.*, that minority displacement from the hurricane caused a systemic underrepresentation in its Jury Selection Plan—by relying on the third *Duren* prong. *See, e.g.*, *United States v. Haynes*, No. 05-308, 2006 WL 1236059, at *1 n.1 (E.D. La. May 3, 2006) (listing cases). In *Haynes*, the district court first noted that "even assuming for purposes of this motion that African-Americans were displaced disproportionately by the storm, the defendant cannot establish the second requirement, that the representation of African-Americans in venires from which juries are selected is not fair in relation to the number of such persons in the community." *Id.* at *2. But even if the defendant had demonstrated underrepresentation, the court said, he failed to demonstrate that it was the result of systematic exclusion on the government's part. "There is systematic exclusion when the under representation is due to the system of jury

---

[8] The defendants also allege that the jury questionnaire will screen out "individuals in a 'higher risk' category for contracting COVID-19, individuals who are currently sick or have been directed to quarantine and may not be recovered or released from such restrictions before the report date, individuals employed in certain healthcare positions, and individuals with children requiring their direct supervision and who lack other childcare options." DE 968 at 9 (quoting General Order No. 2020-20 at 6 n.2). "Because these groups necessarily include a higher proportion of minorities and those with childcare responsibilities," the defendants say, "a jury pool that has screened for these groups before *voir dire* will necessarily underrepresent people of color and women." *Id.* Of course, the defendants can offer no data as to how the absence of these populations will affect the overall jury pool, much less affect it in comparison to the broader community. Moreover, the defendants' "fears are speculative and unfounded." Order, *United States v. Kristopher Lee Dallmann, et al.*, No. 1:19-cr-253-TSE (E.D. Va. Aug. 11, 2021), Dkt. No. 631 at 2 (observing that "defendants' speculative inferences are refuted by the fact that jury trials have been successfully conducting in [the Alexandria] Division throughout much of the COVID-19 pandemic, and the juries in those cases represented a fair-cross section of the community").

selection itself, rather than external forces." *Id*. (quoting *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996)) (citing cases in which demographic changes, bad weather, and natural disasters resulted in underrepresentation in the jury venire but did not amount to constitutional violations). The court ultimately held that "[i]n this case, any under representation, if it exists, was caused by natural disaster, and not by any systematic flaw or subjectivity in the Jury Selection Plan." *Haynes*, 2006 WL 1236059, at *3. As a result, the court denied the defendant's motion to quash the venire and to stay the trial proceedings.

Likewise, in *United States v. Dixon*, No. 05-209, 2006 WL 278258, at *2–6 (E.D. La. Feb. 3, 2006), the district court noted that an expert statistical report on the proportion of African-Americans displaced by the three hardest hit parishes following Hurricane Katrina would "contribute nothing toward proving a disproportion between the percentage of African-Americans eligible for jury duty in the community and the percentage in the defendant's jury venire," which had yet to be assembled. *Id*. at *4. However, its ultimate denial of the jury challenge turned on the defendant's failure to establish the third *Duren* prong because "[w]here external forces rather than the operation of the selection process have caused an underrepresentation, the Sixth Amendment has not been read to impose an affirmative duty on the courts to remedy that disparity." *Id*. at *5. Hurricane Katrina, it concluded, was undoubtedly an external force, and thus could not constitute either a constitutional or statutory violation. *Id*.

Similarly, the COVID-19 pandemic, a natural disaster in its own right, would fail to give rise to a fair-cross-section claim under the third prong of the *Duren* test, even if the defendants could demonstrate a statistically significant underrepresentation of minority groups in the venires (which they have not). Here, the defendants, just like those in *Dallmann*, "fail to meet the requirement for establishing a *prima facie* violation of the fair cross-section requirement." Order,

9

*United States v. Kristopher Lee Dallmann, et al.*, No. 1:19-cr-253-TSE (E.D. Va. Aug. 11, 2021), Dkt. No. 631 at 3 n.1.  Thus, their fair-cross-section claims is meritless.

### III. The Defendants' Concern that Jurors Will Be Unduly Distracted Is Baseless

The defendants worry that "the external influence of the risks presented by the COVID-19 pandemic will materially distract the jury should the trial proceed on September 13 during the height of the current Delta variant surge."  DE 968 at 8; *see also id.* ("[I]t stands to reason that [the jurors] will be inordinately distracted as trial proceeds and rushed during deliberations, to the likely prejudice of the defendants.").[9]  This speculative argument is unpersuasive and, importantly, "is contradicted by experience in . . . post-COVID trials conducted in this District."  Order, *United States v. Kristopher Lee Dallmann, et al.*, No. 1:19-cr-253-TSE (E.D. Va. Aug. 11, 2021), Dkt. No. 631 at 3.  Prospective jurors in this case are no less capable of paying attention and deliberating judiciously than the many jurors who have succeeded in doing so in the numerous trials that have taken place in this District since the pandemic's advent.  Thus, the defendants' fears relating to juror distraction do not justify a continuance.

### IV. Hypothetical Developments in the Severed Trial of a Co-Defendant Supply No Basis for a Continuance

The defendants seek to incentivize the Court to grant their request for a continuance by suggesting that if the Attorney General decides to deauthorize seeking the death penalty against their capital co-defendant, Elmer Zelaya Martinez ("Zelaya"), the Court could consolidate their

---

[9] The defendants assert that the peak of the delta-variant surge will occur next month when the trial is currently scheduled to begin.  Perhaps.  But it might just as well be that the height of the surge in this Division is occurring right now, and that measures recently adopted or recommended by the CDC and local public health officials will reduce the number of infections by next month.  The point, of course, is that the defendants see certainty where it is fundamentally lacking.

10

trial with his. But these imagined efficiency gains are, like all of the defendants' arguments, predicated on pure speculation.

On January 6, 2020, the government noticed its intention to seek the death penalty against Zelaya. DE 425. While a mechanism for reconsideration of that decision exists, *see generally* U.S. Dep't of Justice, Justice Manual § 9-10.160 (2018), it is important to note that as of this memorandum's filing, the current administration has in no way revised those procedures, which ordinarily require "material changes in the facts and circumstances of the case from those that existed at the time of the initial determination," *id.* § 9-10.160(A), before withdrawal of a notice of intention to seek the death penalty will be contemplated.[10] Notably, § 9-10.160 says nothing about how quickly the process must unfold. Unless and until the Attorney General instructs the government to rescind its death-penalty notice, the government must "proceed with the case as initially directed by the Attorney General." *Id.* § 9-10.160(B).[11] The trial date for the non-capital defendants should not hinge on what might (or might not) come to pass in the capital case.

## CONCLUSION

For the reasons stated, the defendants' motion should be denied.[12]

---

[10] The subtext of the defendants pointing to the possibility that Zelaya's capital case might be deauthorized seems to be their assumption that the current administration no longer wishes to pursue the death penalty. That might one day prove to be true, but it clearly is not where things currently stand. *See, e.g.*, *United States v. Tsarnaev*, No. 20-443, S. Ct., Br. for the United States, 2021 WL 2474574 (June 14, 2021) (urging Supreme Court to reinstate defendant's capital sentences that were vacated by court of appeals).

[11] The government notes that "[t]he fact that a withdrawal request has been made is confidential and may not be disclosed to any party outside the Department of Justice and its investigative agencies." Justice Manual § 9-10.160(B).

[12] On August 12, 2021, the Court entered an order requiring the government to respond to the defendants' motion to continue by August 20, 2021, and scheduling a hearing for August 26, 2021, to entertain oral argument on the matter. DE 972. Given that the government is filing its response today, over a week in advance of the Court's deadline, if the Court wishes to advance the hearing date, counsel for the government will be available.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By:     /s/
Rebeca H. Bellows
Alexander E. Blanchard
Cristina C. Stam
Jacqueline R. Bechara
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
becky.bellows@usdoj.gov
alexander.blanchard@usdoj.gov
cristina.stam@usdoj.gov
jacqueline.bechara@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that on August 12, 2021, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

                                                                      /s/
                                            Alexander E. Blanchard
                                            Assistant United States Attorney