```
                                                                    1
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                          ALEXANDRIA DIVISION

3    ---------------------------------x
                                      :
4    UNITED STATES OF AMERICA         : Criminal Action No.:
                                      : 1:18-cr-123
5                                     :
          v.                          :
6                                     : October 20, 2022
     RONALD HERRERA CONTRERAS,        :
7                                     :
                    Defendant.        :
8    ---------------------------------x

9              TRANSCRIPT OF SENTENCING HEARING
          BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.
10              UNITED STATES DISTRICT COURT JUDGE

11   APPEARANCES:

12    FOR THE GOVERNMENT:      ALEXANDER BLANCHARD, AUSA
                               CRISTINA STAM, AUSA
13                             United States Attorney's Office
                               2100 Jamieson Avenue
14                             Alexandria, VA 22314

15    FOR THE DEFENDANT:       LANA MANITTA, ESQ.
                               The Law Office of Lana Manitta, PLLC
16                             140B Purcellville Gateway Drive
                               #511
17                             Purcellville, VA 20132

18                             JESSE WINOGRAD, ESQ.
                               The Law Office of Jesse Winograd
19                             PLLC
                               5335 Wisconsin Ave., NW
20                             Suite 440 Box 4035
                               Washington, DC 20015
21

22   OFFICIAL U.S. COURT REPORTER:   MS. TONIA M. HARRIS, RPR
                                     United States District Court
23                                   401 Courthouse Square
                                     Tenth Floor
24                                   Alexandria, VA 22314

25
```

1  (Proceedings commenced at 11:06 a.m.)
2          THE DEPUTY CLERK: Criminal No. 2018-123. United
3  States of America versus Ronald Herrera Contreras.
4          Counsel, please note your appearances for the
5  record.
6          MS. STAM: Good morning, Your Honor. Cristina Stam
7  and Alex Blanchard on behalf of the United States.
8          THE COURT: Good morning.
9          MS. MANITTA: Good morning. Lana Manitta and Jesse
10 Winograd for Ronald Herrera Contreras, who is present.
11         THE COURT: Good morning.
12         Ms. Bellows, you can have a seat in the jury box.
13         MS. BELLOWS: Thank you, Your Honor.
14         THE DEPUTY CLERK: I was just going to go ahead and
15 swear you in.
16         THE COURT: Yes.
17         (Interpreter sworn.)
18         THE INTERPRETER: I do. Teresa Roman, federally
19 certified Spanish interpreter.
20         Good morning, Your Honor.
21         THE COURT: Good morning, ma'am.
22         This matter comes on today for report and
23 sentencing. Are there any corrections, deletions, or
24 modifications to the presentence report in this matter?
25         MS. STAM: Not from the government, Your Honor.

United States v. Ronald Contreras

3

1          MS. MANITTA:  Not from the defense.

2          THE COURT:  The presentence report will be made a
3 part of the record in this matter.

4          Is there any evidence from the government?

5          MS. STAM:  Your Honor, Ms. Karla Triminio, the
6 mother of Sergio Triminio, and his aunt are present in the
7 courtroom.  Ms. Triminio had expressed an interest in perhaps
8 addressing the Court, but if I could check with her if she
9 would like to do that at this time.

10          (Counsel confers.)

11          THE COURT:  Yes, ma'am.  She does want to make a
12 statement?

13          MS. STAM:  She does, Your Honor.

14          THE COURT:  Pursuant to statute, victims are
15 entitled to make a statement to the Court during the
16 sentencing proceeding.  The Court has previously authorized
17 the court clerk to provide an oath to the person who wants to
18 address the Court.  As far as I know, the person's native
19 language is Spanish, and we've provided a court certified
20 interpreter to assist her in the presentation of her remarks.

21          (Statements made through the Spanish interpreter.)

22          MS. TRIMINIO:  Good morning, Your Honor.

23          THE COURT:  Good morning, ma'am.

24          MS. TRIMINIO:  I am Karla Triminio.  I am the mother
25 of Sergio.  I am here today so that I can hear and see what

United States v. Ronald Contreras

4

1 would be said, and what sentence will be imposed of the young

2 man who is accused.  And as always, I come here to ask for

3 justice for my son, and to thank everyone who has worked on

4 this case.  And I just come here to, again, ask for justice

5 and so that the death of my son does not go unpunished, that

6 all the suffering I have gone through these years, and I

7 continue to go through, because of the absence of my son, the

8 change that it had on my life, all of this did.

9        Again, I ask for justice and this person to be

10 punished as he deserves.  That is all, Your Honor.  Thank you

11 very much.

12        THE COURT:  Thank you, ma'am.  I am very sorry for

13 your loss.  I have heard you both in written form and in

14 addressing the Court.  You've expressed the loss that you feel

15 because of these circumstances.  The Court will consider what

16 you have to say in an attempt to, as you say, achieve justice.

17        MS. TRIMINIO:  Thank you.

18        THE COURT:  Thank you. Any additional evidence from

19 the government?

20        MS. STAM:  No, Your Honor, just argument.

21        THE COURT:  Any evidence from the defendant?

22        MS. MANITTA:  No, Your Honor.

23        THE COURT:  Argument from the government?

24        MS. STAM:  Thank you, Your Honor.

25        Your Honor, as I was reflecting about the

United States v. Ronald Contreras

5

1 sentencing, it occurred to me that we may not be here today if
2 it weren't for the defendant, Ronald Herrera Contreras, or as
3 he was known within the MS-13 gang, Speedy. And that's
4 because, as we learned during the eight-week trial we had
5 earlier this year, it was the defendant who took Detective
6 Betts to the graves in Holmes Run Park, in early March 2017,
7 where law enforcement then found the remains belonging to
8 Edvin and Sergio, the two boys who were brutally murdered by
9 MS-13 in August and September of 2016.
10 But as we know, also from the evidence adduced at
11 trial, the defendant did not lead Detective Betts to Holmes
12 Run Park because he wanted to take responsibility, or because
13 he wanted to assist law enforcement in solving the missing
14 persons case that had been opened for Edvin and Sergio. He
15 wanted to help himself. He had been recently arrested in
16 Fairfax County for raping a 15-year-old girl and he thought he
17 could get something in return if he gave law enforcement
18 something useful.
19 THE COURT: Isn't his desire to help himself, in
20 many ways, no different than other persons who testified in
21 support of their desire to get a consideration under Rule 35?
22 MS. STAM: Certainly, Your Honor. I think that, you
23 know, those people also want to help themselves, but I think
24 that what's different here is that from the very beginning
25 this defendant never told the truth and he repeatedly, and

United States v. Ronald Contreras

6

consistently, minimized his own involvement.  And he spun this web of lies where he was changing a story -- minimizing his role.  But we know what his role was and that was that he, along with the PVLS members -- the PVLS clique, helped to plan, first, Edvin's murder, then he attacked and killed Edvin.  He filmed the murder on his cell phone, and he even broke his legs with an ax so that his body would fit in the hole that had been dug.

And then with Sergio, it was the defendant who helped spread a rumor that Sergio was a police informant, which, of course, he was not.  And he urged PVLS leaders to green light Sergio.  He then was involved in helping to lure Sergio -- very actively involved in helping to lure Sergio to Holmes Run Park.  He was the first person to grab Sergio from behind, from the neck -- by the neck, so that the others who were present could attack him.  And before he buried Sergio, he tied up his body with pajama pants that he had been wearing, and he stole the shoes off of his feet.  The shoes that his mother had just bought for him, but for his 14th birthday.

And, Your Honor, I think also the difference is that he, up to this date, has shown no remorse.  He bragged about the murders in the aftermath, he took pictures on top of one of the graves flashing MS-13 signs.  And even two years later, when he was arrested on federal charges for this case, he said

1 some of the following things to Detective Betts.  When asked
2 if Edvin had fought back during the attack the defendant
3 called Edvin "stupid" and he said, "he didn't even last
4 two-minutes, that chicken."  He then laughed as he described
5 how Edvin had been stabbed about 20 times in less than one
6 minute.
7 　　　　　And when the agents asked him and confronted him
8 about taking Sergio's shoes, the defendant admitted that he
9 had taken them because, quote, It was a sin to bury that
10 chicken, end quote, with those new shoes.
11 　　　　　And so, Your Honor, those words are not of someone
12 who made poor choices, or only made poor choices and put
13 himself -- finds himself in this position, they're also the
14 words of someone who has no respect for human life, has no
15 respect for the law, and who, frankly, has nothing but
16 darkness inside of them.  And that's who the defendant has
17 proven to be.
18 　　　　　And so, even if a life sentence was not required by
19 statute here, there's no other sentence that would be just.
20 The defendant, for his actions, deserves to spend the rest of
21 his life in prison and his sentence should also be a warning
22 to his gang that violence against young, vulnerable boys will
23 not be tolerated.
24 　　　　　And so, Your Honor, for that reason, we'd ask that
25 the Court sentence the defendant to life for the -- Counts 3

United States v. Ronald Contreras

8

1 to 8, and that the Court sentence him to the ten-year maximum

2 penalties for Counts 1 and 2, which are the five-part

3 conspiracy counts.

4     We ask that you also order that he be placed on

5 supervised release for five years should he ever be released

6 from the Bureau of Prisons custody.  And as I mentioned, I

7 believe at our last sentencing, Your Honor, we're working

8 closely with the family members, including Ms. Triminio, to

9 arrive at restitution.  So we would ask for that same

10 November 28, 2022 deadline to get all the restitution numbers

11 and submit an order to the Court.

12     THE COURT:  Thank you.

13     MS. STAM:  Thank you.

14     THE COURT:  The Court is aware of everyone who is in

15 the courtroom.  Two other people came into the courtroom after

16 the matter was started.  I want to make sure that you're not

17 potential witnesses in the case, either for the government or

18 for Mr. Herrera Contreras.

19     Sir, what is your name, sir?  Right over here.  Sir,

20 with the glasses, what's your name, sir?

21     SPEAKER:  Jeremy.

22     THE COURT:  Jeremy what, sir?

23     SPEAKER:  Didios, D-i-d-i-o-s.

24     THE COURT:  Are you here as a witness for someone?

25     SPEAKER:  No.

United States v. Ronald Contreras

9

1  THE COURT: Ma'am, what is your name?

2  SPEAKER: Danielle Delsi (ph).

3  THE COURT: Okay. Are you a witness for someone,

4 ma'am?

5  SPEAKER: No.

6  THE COURT: Okay. Just making sure. Had an

7 opportunity for the government and both the defendant to

8 present witnesses and I saw that you all walked in late, so I

9 want to make sure you weren't potential witnesses in the case.

10  All right. Ms. Manitta.

11  MS. MANITTA: Thank you, Your Honor.

12  Mr. Herrera Contreras is a bit more complicated, I

13 think, than the government has described. As we've seen over

14 the last, I think, almost four years of this case that's been

15 going on, he's a pretty conflicted young man. He's beholden

16 to the gang. They have been family since age 11, but he's

17 also willing to turn on them.

18  THE COURT: He has been probably, out of all of the

19 individuals that have been before the Court, the most

20 troubling. And let me explain to you why I believe he is the

21 most troubling. As counsel for the government pointed out,

22 but for his assistance, they probably would not have been able

23 to find the bodies. But for his involvement and other things,

24 we would not have been aware of certain things that are going

25 on. But for his representations as to him feeling for the

United States v. Ronald Contreras

10

1 victim before he was killed that's compelling.

2 But on the other hand, he's involved in all of the
3 other things, as the fact-finder found, as far as taking the
4 lives of these two young men, and it actually presents, as far
5 as this Court is concerned, a dichotomy in what a person could
6 be in something as serious as this. And, obviously, the jury
7 found that he's responsible and the Court needs to do what it
8 needs to do. But the bottom line is he presents quite the
9 dilemma for the Court as to what kind of person he really is
10 deep down inside, because in some respects it could be argued
11 that the information that he provided was more helpful than
12 the Rule 35 context than what other people did.

13 MS. MANITTA: And, Your Honor, you've taken almost
14 all the words right out of my mouth. He is a dichotomy.
15 Mr. Winograd and I have struggled with that since the very
16 beginning of representing him. I mean even on the night of
17 Sergio's murder he warned him to run, and then he
18 participated. So really there is a struggle going on within
19 him. It has been going on since he's 11. The best I can say
20 based on some of the work we have done with him
21 pre-authorization with Michelle Quiroga, and having talked to
22 a traumatologist that I was trying to enlist as part of the
23 defense, is that a lot of this, sort of, two people in one is
24 most likely a product of the brutality that he witnessed at a
25 very young age. And what that does to any man's brain, but,

United States v. Ronald Contreras

11

1  especially, a young man with no guidance, no parents, he's
2  taken in by the gang, and, I mean, we're talking about finding
3  heads in the street, standing next to people who are getting
4  shot.  It's unbelievable -- unbelievably brutal what he saw
5  between the ages of 11 and 15.  He came here very shortly
6  thereafter, and all of this happened shortly thereafter.
7           Were there available to us a mental-health-related
8  defense, short of insanity, we were preparing to make it.
9  There is definitely a study that has been done with child
10 soldiers over in Africa that tracks very similarly with what
11 we see with these young men being recruited in Central America
12 to gangs.  The targeted age is 11 to 14.  They're exposed to
13 brutal violence very early and what that does to them is sort
14 of break their brain so that when faced with situations of
15 violence, they are unable to make the decision that a normal
16 member of society would make.  They are -- they cannot do it.
17 They will not make the right decision.  This is something that
18 I wish we could have explored more with Ronald.  It would not
19 have been a defense in his case, but I absolutely think it
20 would have been applicable.  It's very, very sad.
21          A couple of things that we didn't mention, but are
22 in the PSR, also is that his IQ with Dr. Quiroga was found to
23 be a maximum of 70.  And so we have an individual with such a
24 traumatic history, a very low IQ, extensive cooperation.  The
25 agent -- I think I had asked if it was case breaking, and the

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

1 answer was, yes. So it is by far the most substantial
2 information that was given during this investigation. And
3 make no mistake, the others did not cooperate until they had a
4 deal, and until they had a lawyer. So all of these interviews
5 that Ronald gave where he might have minimized and the story
6 evolved and changed, he didn't have an attorney at one of
7 those interviews or advising him before the interview. And a
8 lot of them he reached out to an officer in the jail and said,
9 Hey, I'd like to have a meeting. And this was without
10 representation. And he did that without a deal. Nobody put
11 anything in front of him to say, Hey, you're going to get a
12 Rule 35 if you tell us. Until those others got that they
13 didn't say a word. And who knows if everything they said was
14 100 percent.
15       So this is really a very sad situation. He did not
16 have a deal; he did not have an offer. And he'll spend the
17 rest of his life in prison. But we're hoping to make the
18 record and what we've submitted under seal, what we've said in
19 our paper, what we're saying here in court today, that, you
20 know, hopefully someday there will be some alternative.
21       THE COURT: All right. Thank you, ma'am.
22 Mr. Herrera Contreras, you may stand, sir.
23       Is there anything you want to say to the Court
24 before the Court imposes a sentence in this matter?
25       MS. MANITTA: Your Honor, because we will be noting

United States v. Ronald Contreras

13

1 an appeal, he's not going to allocute.

2 THE COURT: Okay. All right. Obviously, you're
3 entitled not to allocute.

4 Did you want to say anything to Ms. Triminio?

5 THE DEFENDANT: No.

6 THE COURT: All right, sir. You may have a seat.

7 The combined adjusted offense level is 45 pursuant
8 to Chapter 5, Part A, comment number 2 of the guidelines, in
9 those rare instances where the total offense level is
10 calculated in excess of 43, the offense level will be treated
11 as 43. Therefore, the defendant's total offense level is 43.

12 The criminal history score is 1 and the criminal
13 history category is Roman numeral I. Accordingly, the
14 applicable guideline range is life in prison. Supervised
15 release range is three to five years under the guidelines and
16 the fine range is $50,000 to $250,000. Pursuant to 18 U.S.C.
17 Section 3553(a), the Court should consider the following:

18 The nature and circumstances of the offense and the
19 history and characteristics of the defendant, the need for the
20 sentence imposed to, among other things, reflect the
21 seriousness of the offense and adequately deter criminal
22 conduct, the kinds of sentences available, the guidelines,
23 policy statements issued by the sentencing commission, the
24 need to avoid unwarranted sentencing disparities among
25 defendants with similar records found guilty of similar

United States v. Ronald Contreras

14

1  conduct; and finally, the need to provide restitution to the
2  victims.  Ultimately, under the *Booker* standard, the sentence
3  must be a standard of reasonableness.
4  　　　　　With respect to the 3553(a) factors, the history and
5  characteristics of the defendant, the Court has considered the
6  defendant's specific circumstances, including his difficult
7  childhood in El Salvador, and the resulting trauma he has
8  experienced.
9  　　　　　As to the nature and circumstances of the offense,
10 suffice it to say that murder is a reprehensible crime.  The
11 tragic details, as heard by this Court and found by the jury,
12 the defendant's participation in the murders of Edvin Mendez
13 and Sergio Triminio attest to the severity of the defendant's
14 crime.
15 　　　　　The defendant, based upon what the jury found,
16 callously chose to join a large group of gang members and
17 associates to deceive two defenseless victims and proceeded to
18 brutally murder them.  What is more, the Court considers the
19 fact that the defendant committed these heinous crimes all so
20 that he could advance himself in the gang and earn a
21 promotion.  And although the defendant indeed led
22 investigators to the location of the victims' bodies, his
23 reason for doing so were at best self-serving.  And even then
24 he attempted to cover up his own involvement when questioned,
25 his harmful offenses, and particularly in light of the manner

1 in which the defendant and his coconspirators carried them
2 out, warrants a sentence of life imprisonment.
3     The Court next considers the need for the sentence
4 imposed to reflect the seriousness of the crime, promote
5 respect for the law and to provide just punishment for the
6 offense, to afford adequate deterrence from criminal conduct,
7 to protect the public from further crimes of the defendant,
8 and to provide the defendant with needed educational,
9 vocational training, medical care, or other correctional
10 treatment in the most effective matter.
11     Applying these factors to this case, the Court finds
12 that a sentence of life imprisonment sufficiently promotes the
13 seriousness -- reflects the seriousness of the offense and
14 will promote both specific and general deterrence.  As
15 mentioned by both parties, the guideline range for such an
16 offense is life imprisonment.  A sentence of life imprisonment
17 on Count 3 and 8 [sic] will not create unwarranted sentencing
18 disparities in this case or others.  And the sentence is also
19 consistent with sentences imposed for other defendants who
20 committed similar offenses, including his similarly situated
21 codefendants who have been previously sentenced by the Court.
22     Accordingly, on Counts 1 and 2, conspiracy to commit
23 kidnapping and murder, the Court imposes a term of 120 months
24 on each count, which shall run concurrently.
25     On Counts 3 through 8, the Court imposes a term of

United States v. Ronald Contreras

16

1  life imprisonment on each count, which shall also run
2  concurrently.  In imposing a life sentence based on the
3  prevailing precedent, the Court does not find any 8th
4  Amendment considerations.
5          The Court also imposes a period of supervised
6  release to provide an added measure of deterrence and
7  protection based upon the facts and circumstances of this
8  particular case, consistent with the guidelines under Section
9  5D1.1.  Should the defendant ever be released from
10 incarceration, he will serve a term of five years of
11 supervised release representing three years as to Count 1 and
12 2, and five years as to Count 3 through 8.  All, again, to run
13 concurrently.
14         During the supervised period -- during this period
15 of supervision, the defendant must comply with the standard
16 conditions that have been adopted by this Court as well as the
17 following special conditions:
18         The defendant is to be surrendered to a duly
19 authorized immigration official of the Department of Homeland
20 Security for deportation review in accordance with the
21 established procedures provided by the Immigration Nationality
22 Act.  As a further condition of supervised release, if ordered
23 deported, the defendant shall remain outside of the United
24 States of America.
25         If the defendant tests positive for controlled

Tonia M. Harris OCR-USDC/EDVA 703-646-1438
EASTERN DISTRICT OF VIRGINIA

United States v. Ronald Contreras

17

1   substance or shows signs of alcohol abuse, the defendant shall
2   participate in a program approved by the United States
3   Probation Office for substance abuse, which the program may
4   include residential treatment and testing to determine whether
5   the defendant has reverted to the use of drugs or alcohol with
6   partial costs to be paid by the defendant, all, again, as
7   directed by the probation officer.
8          The defendant shall not use marijuana or cannabis in
9   any form and shall not associate with any known or suspected
10  gang members.  The defendant shall participate in a program of
11  mental health and counseling as directed by the probation
12  officer.
13         Recognizing the defendant is not capable of paying a
14  fine, the Court declines to impose such a fine.  The Court
15  will impose a special assessment of $800.  $100 per felony
16  count pursuant to 18 U.S.C. Section 13 -- Section 3013.
17         The Court is going to request that the government
18  postpone the determination of the victim's restitution amount
19  to November 28, 2022, pursuant to 18 U.S.C. 3664(d)(5).  And
20  if the victim's losses are not ascertainable prior to
21  sentencing, the Court shall set a final date for determination
22  of victim's losses not to exceed 90 days after this date.
23         Ms. Manitta, I believe you've indicated that the
24  defendant is going to exercise his right of appeal.  Will you
25  be representing him on that appeal?

United States v. Ronald Contreras

18

1  MS. MANITTA: Actually, we were going to ask that
2  Mr. Winograd take the lead on that appeal. As the Court
3  knows, we had two and I'm going to take the lead on the other.
4  We will be working on it together, but this way he's the lead
5  on the one and I'm the lead on the other.
6  THE COURT: Mr. Herrera Contreras, Ms. Manitta is
7  well-respected by this Court and will advise you of the
8  substance of how you can take your matter up to the Fourth
9  Circuit of the United States Supreme Court. The Court will
10  appoint Mr. Winograd to be your primary advocate responsible
11  for advancing your appeal.
12  Do you have any questions, sir?
13  THE DEFENDANT: No.
14  THE COURT: I'm sorry.
15  (Counsel confers.)
16  MS. MANITTA: Your Honor, there is one additional
17  thing. We would request designation not in the DMV or
18  Virginia area.
19  THE COURT: Why don't we do this, why don't you get
20  together with the United States Marshal Service and figure out
21  with them the best place for your client to be placed, and
22  then the Court will recommend that that placement take place.
23  MS. MANITTA: Okay. That's fine.
24  THE COURT: Mr. Herrera Contreras, what Ms. Manitta
25  is trying to do is make sure that you're not put in danger or

United States v. Ronald Contreras

19

1 compromised and is trying to arrange a facility that will not
2 put you in conflict with other people who may not have your
3 best interest at heart.  We'll take a look in trying to find
4 the best place for you, sir.
5          I remand you to the custody of the United States
6 Marshals.
7          For the record, I want to thank Ms. Manitta and
8 Mr. Winograd for their zealous representation on behalf of
9 Mr. Herrera Contreras and their professionalism during the
10 entire course of the proceeding.
11          MS. MANITTA:  Thank you, Your Honor.
12          MR. WINOGRAD:  Thank you, Your Honor.
13
14          **(Proceedings adjourned at 11:30 a.m.)**
15
16
17
18
19
20
21
22
23
24
25

Tonia M. Harris OCR-USDC/EDVA 703-646-1438
EASTERN DISTRICT OF VIRGINIA

```
 1                    CERTIFICATE OF REPORTER

 2

 3           I, Tonia Harris, an Official Court Reporter for

 4   the Eastern District of Virginia, do hereby certify that I

 5   reported by machine shorthand, in my official capacity, the

 6   proceedings had and testimony adduced upon the Sentencing

 7   hearing in the case of the UNITED STATES OF AMERICA versus

 8   RONALD HERRERA CONTRERAS, Criminal Action No.: 1:18-cr-123,

 9   in said court on the 20th day of October, 2022.

10           I further certify that the foregoing 20 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this April 19, 2023.

17

18

19

20

21   _____
     Tonia M. Harris, RPR
22   Official Court Reporter

23

24

25
```